HEIDENHEIMER, STRASSBURGER & CO.
v. ALEXANDER & BAIRD. (No. 5847.)

(Court of Civil Appeals of Texas. Austin. Feb.
6, 1918.)

1. CUSTOMS AND USAGES ☞20—PROOF.

In an action by seller of oranges, a finding of the court that the custom of Texas jobbers in buying perishable goods only subject to inspection at destination, was not shown by the testimony to be so general and notorious that the seller might be presumed to have had knowledge of it, *held* against the weight of the evidence.

2. CUSTOMS AND USAGES ☞12(1) — KNOWLEDGE OF PARTIES.

When it is shown that both parties to a sale were engaged in the same kind of business, and one of them relied upon a custom in that particular line of business, it is not necessary to show that other party had knowledge or notice of the existence of such custom.

3. CUSTOMS AND USAGES ☞12(1)—DELIVERY—RIGHT OF INSPECTION.

When merchandise is ordered from another state or distant point, and the contract is silent as to where delivery shall be made, it is permissible for the buyer, in order to show that he did not intend to contract for delivery of the property elsewhere than at the place of its destination, to show that it was the custom and usage at the latter point for final delivery to be made, and that purchaser had right of inspection and rejection, although seller was ignorant of the custom.

4. SALES ☞79—PLACE OF DELIVERY.

Where the contract is silent, delivery by seller to carrier is prima facie evidence of the delivery to the purchaser, but is not conclusive evidence of that fact.

Appeal from District Court, Travis County; Ireland Graves, Judge.

Suit by Alexander & Baird against Heidenheimer, Strassburger & Co. Judgment for plaintiffs, and defendants appeal. Reversed and remanded.

Fiset, McClendon & Shelley, of Austin, for appellants. Thelbert Martin and A. S. Phelps, both of Austin, for appellees.

KEY, C. J. Appellees, Alexander & Baird, brought this suit against appellants, Heidenheimer, Strassburger & Co., and sought judgment for $962.80, the purchase price of two cars of oranges shipped by appellees to appellants; the destination of one car being Austin, and the other Giddings, Tex. Appellants filed an answer, the particulars of which need not be stated, as it will suffice to say that the pleadings of each party were sufficient. The case was tried without a jury, judgment rendered for plaintiffs, and the defendants are prosecuting this appeal. The trial judge filed the following findings of fact and conclusions of law:

"Findings of Fact.

"(1) The plaintiffs are residents of De Soto county, Fla., where they are engaged in the business of growing and selling oranges at wholesale. The defendants are grocery, fruit, and produce jobbers residing in Travis county, Tex.

"(2) On or about October 25, 1913, through the means of letters and telegrams, defendants purchased from plaintiffs two cars of oranges to be shipped from Wauchula, Fla., about November 25, 1913, one car to Giddings, Tex., and the other to Austin, Tex., for which defendants agreed to pay plaintiffs the sum of $962.80 f. o. b. the cars at Wauchula, Fla. The date for shipment as well as the delivering carrier was designated by defendants, but no agreement was made with respect to the date when the cars were to reach their destinations.

"(3) The agreement contemplated that payment should be effected by a draft drawn by plaintiffs on the defendants through the Austin National Bank in Austin, Tex. The contract is silent as to whether the shipments should be billed 'open,' by which is meant that the purchaser is named as the consignee in the bill of lading, and the latter sent through the mails direct to the purchaser, or whether the bill of lading should be drawn to 'shipper's order, notify purchaser (naming him),' and sent through the bank attached to the draft for the purchase money. The evidence is that while the latter is the method more generally employed in Texas, yet 'open' shipments are sometimes made; in this instance the shipment was 'open.'

"(4) The plaintiffs, in the negotiations leading up to the sale, represented that the quality of the oranges would be first-class and that they would be properly packed. I find that two cars of such oranges as were contemplated by the contract, and properly packed, were delivered by the plaintiffs to the carrier, consigned to defendants, one car on November 25 and the other on November 26, 1913.

"(5) The Giddings car arrived about December 2d, and defendants were promptly notified. Date of arrival of Austin car is not shown, but on December 5th, after having inspected the Austin car, the defendants sent to plaintiff the following telegram:

"'Austin car shows twenty per cent. decay now presume Giddings likewise will you protect us.'

"After which the following telegrams were exchanged between the parties on the dates shown thereon:

"'Deland, Fla., Dec. 5, 1913.

"'Heidenheimer-Strassburger Co., Austin, Texas: Car went out of shipping point in fine condition weather was very favorable here we offer you a reduction of thirty cents a box, which makes us a heavy loss quick reply desired.      Alexander & Baird.'

"'Dec. 6, 13.

"'Alexander & Baird, Deland, Fla.: Your offer seems liberal but prefer having car repacked and pay you accordingly otherwise handle Californias with which no trouble same applies to Giddings car, answer quick.
     'Heidenheimer, Strassburger Co.'

"'Beresford, Fla., December 7th, 1913.

"'Heidenheimer, Strassburger & Co., Austin, Texas: We must make immediate settlement weather conditions your end cause of decay perfect condition leaving us sold f. o. b. Florida we made you very liberal offer causing us heavy loss answer quick.
     'Alexander & Baird.'

"'Dec. 8th, 13.

"'Alexander & Baird, Beresford, Fla.: We buy all perishable goods subject inspection unless otherwise contracted at, cannot buy cat in bag, will substitute with Californias today unless you accept our proposition quick.
     'Heidenheimer, Strassburger Co.'

"'Beresford, Fla., Dec. 9–13.

"'Heidenheimer, Strassburger Co., Austin: If cannot accept car at reduction offered advise what amount you must have off as we must

know for settlement name best figure shipping point answer quick. Alexander & Baird.'

" 'Dec. 9th, 13.

" 'Alexander & Baird, Beresford, Fla.: Answering yours, forced refuse both cars bought elsewhere.

" 'Heidenheimer, Strassburger & Co.'

"(6) The weather conditions at Austin and Giddings from about December 1st to 10th, inclusive, were unfavorable for keeping oranges in cars. The weather at Wauchula, Fla., when the cars left there was favorable for shipping. The Austin car showed about 20 per cent. decay on December 5th, and the Giddings car, when inspected by defendants for the first time on December 19th, showed a higher percentage of decay.

"(7) The railroad company, being unable to make delivery of the cars, disposed of them for the purpose of collecting the freight, and no part of the proceeds is shown to have been received by either party to this suit. The plaintiffs drew on defendants through the Austin National Bank, and the drafts were permitted to go to protest, for which plaintiffs paid out the protest fees, as alleged. No part of the purchase price or protest fees has ever been paid to plaintiffs.

"(8) It is shown that the Texas jobbers are in the habit of buying fruit and other perishable goods subject to inspection and rejection or acceptance at destination. While it does not affirmatively appear, it may be fairly inferred from the evidence that the practice of inspecting the fruit before accepting the car is invariably pursued by the Texas jobbers. Under this practice, if the fruit is found to be in unsatisfactory condition the shipper is so notified, and unless an adjustment can be reached the car is rejected; if once accepted, no objection can thereafter be considered.

"(9) At the time the contract was made, and prior to the time of the rejection by defendants of the two cars of fruit, plaintiffs are not shown to have had any actual knowledge of such practice in Texas.

"(10) In the several letters and telegrams leading up to and constituting the contract, no reference to such practice was made; but to hold that such custom was an unexpressed part of the contract would not require the elimination of any of the express terms of the agreement.

"(11) This contract was not made through a local broker, and the evidence fails to show that the custom above referred to was so general, long established, and notorious that plaintiffs may be presumed to have had knowledge of it at the time the contract was made.

### "Conclusions of Law.

"(1) There being neither an expressed nor an implied agreement to deliver the fruit at destination, delivery to the carrier at Wauchula, Fla., was delivery to the defendants; and since it appears from the evidence that the fruit when so delivered, as to quality, quantity, and method of packing, met the requirements of the contract, defendants should be required to pay for same."

### Opinion.

Without referring in detail to the assignments of error, it is sufficient to say that they present the questions hereafter discussed, which may be summarized as follows:

(1) Were appellants entitled to have judgment rendered in their favor upon the facts found by the trial court?

(2) Did that court err in its eleventh finding of fact, to the effect that the usage and custom referred to in the eighth, ninth, and tenth findings was not shown by the testimony to be "so general, long established, and notorious that plaintiffs may be presumed to have had knowledge of it at the time the contract was made"?

(3) When it is shown that both parties to the contract were engaged in the same kind of business, and one of them believes and relies upon a custom or usage in that particular line of business, is it necessary to show that the other party had knowledge or notice of the existence of such custom, before it will be considered in determining the rights of the parties?

(4) When merchandise is ordered from another state or distant point, and the contract is silent as to where delivery should be made, and title passes to the purchaser, is it permissible for the latter, in order to show that he did not intend to contract for delivery of the property elsewhere than at the place of its destination, that it was the custom and usage at the latter point for final delivery to be made there, and that the purchaser had the right of inspection and rejection for noncompliance with the contract, although the seller may have been ignorant of the custom referred to?

[1-3] We have reached the conclusion that an affirmative answer must be given to all of these questions, except the third, which is answered in the negative, and therefore the appeal must be decided in favor of appellants.

Some doubt may exist as to appellants' right to a judgment upon the trial court's findings of fact, but we feel compelled to hold that so much thereof as is quoted above is so contrary to the overwhelming weight of the testimony that it ought not to be permitted to stand, and for that reason, if for no other, the case should be reversed.

The testimony bearing upon that subject is substantially as follows:

"The witness Frank F. Finks testified as follows: 'I live in Austin. I have lived here twelve years. My business is merchandise broker. We handle canned goods, dried fruits, beans, potatoes, apples, oranges, etc. I have been in that business for twelve years. * * * I know the custom in regard to the sale and shipment of oranges and other perishable produce. * * * I handle during the orange season about thirty or forty cars of oranges. * * * I handle Florida oranges—Florida and California both. I have been handling Florida oranges five years; California ten years. I know the firm of Alexander & Baird only by reputation; I know they are in the business. They are large shippers. I am acquainted with the custom in Texas with regard to sales and purchases of oranges and other perishable produce—the custom existing where the shipper sells to Texas jobbers. * * * The seller has to make good the condition of their fruit on arrival at destination. I won't say positively about being irrespective of how the shipment is made, or how it is billed, because on all sales we make—we make f. o. b. and delivered sales both—and if a car comes in showing decay we wire some shippers that cars have arrived in decayed condition, and how much decay we must allow to make delivery, and for other shipments we have authority to make settlements ourselves. The custom when the shipment is made f. o. b. point of origin, when

it arrives in bad condition, is the consignee won't accept unless he gets paid for the loss of decay; in other words, he must have delivery made in good condition. That is whether it is shipped f. o. b. point of origin or shipped delivered, whether you ship open or ship notify consignee, it doesn't make any difference—99 per cent. of the shipments are made f. o. b. with bill of lading attached. * * * If a party makes an order f. o. b. shipment of fruit or other perishable property, he would expect to get it shipper's order bill of lading attached, that would be the custom, and it is the exception where it is shipped open. As to whether it is the duty of the buyer in that case to accept the oranges, I will say, if you can get together and agree on it, the buyer usually takes it. * * * Supposing that purchaser made claim of twenty per cent. damage, and I communicated with my client, the party I was representing, that there was a twenty per cent. damage, and the purchaser was claiming that, and my firm then authorized me to allow it, the purchaser then would be under obligation to accept the settlement. * * * If I say, "This car shows twenty per cent. decay and we will allow you twenty per cent.," and they would say, "All right, we will take it," and we collect on that basis.'

"The witness further testified that it is the usual custom, where the customer claims twenty per cent. damage on account of rot, that it is communicated to the seller and he accepts or rejects. And that the purchaser inspects the property, and if he then offers to settle on a basis of a certain percentage of rot, and such an offer is accepted by the seller, a settlement is made on that basis; but if the proposition is not acceptable to both parties, the purchaser is not bound to accept the settlement. 'As to the purchaser having the right to reject the entire shipment and throw the loss entirely on the shipper, I will say as long as the buyer and the seller hadn't gotten together and agreed on an adjustment, why there is no obligation on the part of the buyer until they do adjust; when they do adjust, of course the buyer should accept at those damages. If you order or ship a carload from here, f. o. b. cars Austin, shipped to San Antonio, direct, upon—direct to you, consigned direct to you, and then you put in another order for another car and I ship it with the draft and bill of lading attached—that is to say, to myself, direct the bill of lading to myself and instruct the bank to notify consignee, notify you—ordinarily there would be a difference between those two kinds of shipments; but in perishable stuff the seller has to invariably guarantee the arrival of stuff in good condition, whether he has quoted the price so much f. o. b. delivered or open; in fruits, potatoes, and everything of that kind you have to make good on arrival. I testified previously that it was the duty of the shipper to protect the buyer to the extent of any damage or rot. As to why it is necessary then for a buyer to telegraph to a seller in these words, "Will you protect me?" when the buyer knows that the seller is bound to protect him, I will say that when a shipment is made either open or bill of lading attached to a consignee, and he goes into the car and accepts it without advising the shipper of the condition, and making a settlement on the actual condition of the stock at that time, then the buyer is obligated for the full amount of the invoice. On account of the produce arriving in otherwise than a perfect condition, you have then got to make a new contract, a new trade; the seller had to make a new contract; that is the way the produce business is handled.'

"The witness B. W. Randolph testified as follows: 'I live in Austin, and have lived here forty years. I am in the fruit and produce business—wholesale business. It will be twenty-two years next month that I have been in that business, here in Austin all that time. I have handled Florida oranges off and on ever since I have been in business, when they could ship. Regarding whether there is any custom or usage among produce buyers and sellers—that is, the shippers and the jobbers—with regard to inspection at destination and rejection on account of not being in good condition on arrival at destination, well, the custom is everything had to be delivered in good condition. As to what is the custom about paying or making payment for perishable property, either f. o. b. or bill of lading attached, I will say most of it is bill of lading attached, and after you accept it then you have to pay it. The custom I think is generally cash—you don't get any time on that stuff to amount to anything, but you certainly have the privilege of inspecting it. It is not the usual custom to ship perishable produce and fruit open, it is the exception when it is done, and the usual thing is to ship it with bill of lading attached. * * * With reference to whether I have had the same experience to other perishable property, well, nearly all Florida oranges I have bought were with bill of lading attached; that is the general custom. It is not customary for produce jobbers to keep accounts with the shippers. We do not keep any accounts at all; we simply pay for it when we get it. Whenever it shows up good we pay for it, and our books merely show merchandise bought. It is all cash when it arrives. I mean to say if shipment is made to me f. o. b. cars shipping point, or loading point, that that would mean inspection here in Austin; that I could refuse to take it; that is the custom.'

"The witness further testified that in any shipments with bill of lading attached to draft, and the bill of lading which doesn't show that inspection is allowed, if the bill of lading fails to show this, the purchaser, before accepting the shipment, has the shipper to wire the carrier to allow inspection. 'It is my understanding that "f. o. b." means "free on board." Now, if this car, or a car of stuff is ordered, and on those terms, I mean to say that there is a custom here that would allow inspection and rejection at this end of the line; no question about that at all. I have received a good many cars f. o. b. loading point, and have received them for the last twenty-one years. There is no shipper that don't understand he is going to deliver that stuff in good condition. Delivered means delivered here at Austin. F. o. b. don't mean Austin; it means f. o. b.; that is, shipping point. I say "goods delivered"; that means here. As to what is the difference between goods delivered and f. o. b. loading point, a shipment of that kind, well, the only thing is this: I don't believe there is a shipper you buy from that don't expect to deliver good stuff. If you order from me some produce shipped to San Antonio, and say, "Mr. Randolph, ship me a box of oranges delivered to San Antonio," that means delivered to San Antonio. As to whether it means that you could inspect them, well, it would with me if I was going to buy it. If I would send you that bill of lading all you would have to do would be to pay the freight, but if bill of lading attached you would have to pay the whole thing. * * * Everything of that kind (oranges) is supposed to come to you in good condition, or you don't have to take it. In the quotations on produce and fruit, etc., the quotations are not all the time f. o. b. point of origin, but they do come either way. The custom about quotations I should say is probably half quoted one way and the other half another. When I wire for it, I ask for delivered price. It is the custom is the reason why the quotations are both ways. I should judge it would be about half and half. I don't know why they quote it f. o. b. point of shipment; I am not in that business at the other end of the line; I buy it here; I buy it to be shipped f. o. b. There is absolutely no difference, according to the custom and usage, about those quotations, except with regard to the freight; so far as shipments are concerned, it

is the same. * * * In both cases I would pay the freight at point of destination. If you accept the stuff you pay the freight, and they deduct it from the amount of the draft.'

"The plaintiff I. Heidenheimer, Jr., testified as follows: 'I am a partner of Heidenheimer, Strassburger & Co. We are in the wholesale grocery and produce business. We have been in that business 28 years, here in Austin. I think I am familiar with the custom and usages of the produce business in Austin, in Texas, and generally throughout the country. * * * The custom about shipments of produce has been ever since I have been in business, and is to-day, that they are subject to inspection on arrival of goods. If the bill of lading does not signify —give permission to inspect—the agent has to wire the shipper for permission to inspect, and upon receipt of that permission we go into the car and inspect the goods. The result of the examination determines whether the car is then accepted or rejected—be it an open shipment or bill of lading attached, it makes no difference, the goods are either accepted or rejected. * * * I am familiar with the custom generally throughout the country with regard to the sale of perishable property. This custom I refer to is a general custom throughout the country, and is a custom which is followed by all shippers of produce of any magnitude. I know the firm of Alexander & Baird by reputation only. I knew them before we made this purchase from them, we had business with them before. They had been doing business in Texas prior to the time we gave them this order. I could not say for sure whether they had any other business in Texas or not. * * * I will say they were pretty fair size shippers. I have bought Florida oranges before; lots of them. With reference to whether Florida oranges are shipped all over the United States, I will say I know they are shipped into Louisiana and Texas. They are handled generally throughout the state of Texas. * * * There was a time when Florida had a very severe frost once, and that put them out of the business for a few years; that has been about ten years ago. With that exception, they have been in the market ever since and before. I have been handling them all the time. In my dealings in Florida oranges I have found no difference whatever in the custom between the shipment of Florida oranges than I found in the shipment of any other perishable produce.'

"This witness further testified, on recross-examination, that in the conduct of his wholesale produce business for some years he consigned goods both bill of lading attached and f. o. b. shipments, and that where produce is received by the consignee or purchaser, and it is not the fault of the railroad company in keeping the goods beyond a reasonable time, the jobber makes good the loss. 'If I ship oranges open to one of my customers, and they are damaged by the railroad company, I don't charge the whole thing to my customer, and he don't stand the loss; we have to stand the loss.' "

Frank E. Lane, who was not in appellees' employ in October, 1913, when the contract was made, but who entered their service November 1, 1913, testified as follows:

"Regarding whether there is any custom known at Wauchula, Fla., to Alexander & Baird that where a shipment is made f. o. b. loading point that those goods can be inspected before they are received by the buyer, I will say we have conducted our business, and are still conducting it, along the lines of business principles, and are not conversant with customs either here, there, or anywhere. We were not aware of any custom in Austin when this shipment was made. The right of inspection is allowed the buyer when shipments are made on delivered business, or with bill of lading and shipper's order, notify consignee. By delivered is meant that if we accept a price from the customer indicating that the order is to be delivered at destination, we feel that we are responsible for those goods until they arrive at the destination and they are in their ownership; but if we ship them f. o. b. point of loading, the rule is that the title to the goods becomes vested in the buyer at the time the bill of lading is issued by the railroad company covering that shipment, and our responsibility ceases; and it is just exactly the reverse when the bill of lading attaches. In Cincinnati or Cleveland, or places where I have lived, I only know of a custom existing there of the right of inspection in case of shipments being made with bill of lading attached or on a delivered price, but not on an open bill, on a sale f. o. b. shipping point basis. Open shipment puts the title in the buyer; bill of lading attached shipment or delivered, that invests the title in the seller until they are delivered and accepted; that is, the bill of lading taken out and draft paid. We did not know of any local custom with reference to shipments of this character. As to how I know that Alexander & Baird did not know of any local customs in Texas that existed at and prior to 1913, I will say I am not familiar with what they knew at and prior to November, 1913, but I am familiar and do know how they felt about customs; and I am familiar with what they knew about customs to November 1st, during that season. The members of that firm when I went to work for them were James A. Baird, N. M. and F. J. Alexander. As to whether they ever sat down and told me what they knew about customs, I will say that Mr. Baird and I conversed about those things very fully. They did not recognize customs; we do not do business by customs, we do business by legitimate business principles. With reference to their knowing there were customs in different localities, I will state they might have recognized that customs were assumed by people in different localities, and recognized they were contrary to business principles."

The testimony of the witness Lane was too general and unsatisfactory to entitle it to consideration for the purpose of disproving the usage and custom testified to by the other witnesses as prevailing in Texas, and the findings of the trial court indicate that little, if any, importance was attached to it. The testimony of the other three witnesses, two of whom appear to have been disinterested, shows that the custom referred to not only existed in Austin, but throughout the state, and perhaps elsewhere, and that it was well established and of long standing. Such being the case, and both parties being engaged in the same line of business, and the property being perishable, authorities are not lacking which hold that it will be conclusively presumed that each party either knows, or should know, of the existence of the custom. Lawson on Usages and Customs, p. 54; Z. T. Fort Produce Co. v. Dissen, 45 Tex. Civ. App. 403, 101 S. W. 477; Bowles v. Driver, 112 S. W. 440; Holder v. Swift, 147 S. W. 691; Dwyer v. City of Brenham, 70 Tex. 30, 7 S. W. 598; Continental Lbr. Co. v. Miller, 161 S. W. 927; Goodenow v. Tyler, 7 Mass. 36, 5 Am. Dec. 22; Bailey v. Bensley, 87 Ill. 556; Lonergan v. Stewart, 55 Ill. 44; Dannemiller v. Kirkpatrick, 201 Pa. 218, 50 Atl. 928.

In Orient Ins. Co. v. Reymershoffer, 56 Tex. 234, our Supreme Court said:

"If a course of business is so constant and general that all persons engaged therein cannot, with a due regard to their own interests, be ignorant of it, they are presumed to have knowledge of it, and it may then be looked to for the purpose of determining the intention of the parties when contracting within the line of such business. A course of business which brings such knowledge is, within the meaning of the law, certain, uniform and general; for those elements of usage are only required to authorize, from the common experience of men, the presumption that the party pursuing the given pursuit has knowledge of the usual course of business. Notoriety of a course of business is the true inquiry, and this is presumed if it be established and general."

We think the overwhelming weight of the testimony brings this case within the rule announced by our Supreme Court in the excerpt quoted. While we do not hold that it was necessary for the proof to show that appellees had knowledge of the existence of the custom referred to, still we do hold that the testimony tended strongly to show that in making the contract the parties did not agree that absolute title to the property was to pass to appellants upon its delivery to the carrier by the shipper. The contract was made by written correspondence, and it contained no specific stipulation as to what should constitute delivery of the property, or when title should pass to the extent of placing all subsequent risks upon appellants. The correspondence referred to consisted, first, of a communication from appellees to appellants soliciting business; to which appellants replied, requesting appellees to "name us your best price on oranges, stating freight rate, shipment about November 24th." Appellees replied:

"We will make you a price on oranges, shipment about November 24th, of $1.60 per box, f. o. b. loading point. Freight the past season was 90.2¢ per box to Austin, and presume will be the same rate this season, but we have not yet received new tariff from R. R. for this season. We handle nothing but first-class fruit, and our packing is strictly high-class. Feel quite sure we can please you, both as to quality of fruit and pack, and hope you will favor us with your order, which we assure you will have our best attention."

Appellants replied to that letter, stating, among other things:

"We note that you are naming price of $1.60 per box, f. o. b., with 90.2¢ freight rate. The price, however, seems to us a little high for this late shipment. We would be willing to give you an order for three cars at $2.40 delivered, and hope that you will see your way clear to accept it. Please wire."

To that letter appellees replied by wire, that the price quoted was the lowest they could offer. Appellants then wrote a letter to appellees, regretting the stand they had taken, and in effect stating that they would accept another offer made by another dealer, unless appellees should reconsider. To that letter appellees replied, and, among other things, stated:

"We could not accept lower price than quoted, viz. $1.60 f. o. b.+90.2 frt."

Three days later appellants wrote appellees a letter, stating that the party who had offered them oranges at $1.55 had in effect withdrawn his offer, and—

"we have therefore concluded to give you the order. We want two cars to be shipped about November 25th, one to Austin, Texas, the other to Giddings, Texas, both via. H. & T. C. Please give us good sizes in each car, Nos. 126 to 216, none smaller, and a few 96's. Draw through Austin National Bank. Please confirm."

To that letter appellees replied, acknowledging receipt, and asking for advice as to exact shipping date of order. They also replied by wire, saying:

"Booked your order two cars oranges Giddings and Austin."

Thereafter appellants wrote to appellees designating November 25th as the time to make the shipment, and stated that they then had an offer of $2.40 delivered, but did not feel like switching the order from appellees, and expressing the hope that the latter would do the right thing by complying with appellants' request for large sizes.

Thus it will be seen that the correspondence, which constituted the contract, did not specifically specify when the title to the property should pass, nor who should bear the loss, if any, resulting from deterioration in transit.

[4] We are not unmindful of the general rule to the effect that when the contract is silent upon the subject, delivery by the seller to the common carrier is prima facie evidence of delivery to the purchaser. But it is not conclusive evidence of that fact, and it may be shown by other circumstances that such was not the intention of the parties, or, if it was the intention of the seller, that the purchaser did not so understand it, and therefore it was not embraced in the contract.

In the case at bar the undisputed testimony of Mr. Heidenheimer, which seems to be confirmed by the connection in which that language was used in the correspondence between the parties, shows that the words and figures, "1.60 per box f. o. b. loading point," referred alone to the question of price, and were not intended to indicate when title to the property would pass. As indicating that appellants did not intend that delivery to the carrier would constitute a delivery to them, and cut off their right of inspection before receiving and paying for the property, we refer to the fact that in two of their letters, one written before and one sent after the contract was made, they mention a price of $2.40 delivered. In the first letter in effect they offer to pay $2.40 per box for the fruit delivered, and in the other one they said that another party had offered to deliver for that price. It is quite clear that the word "delivered," as used in those letters, did not have reference to delivery to the carrier at the place of shipment, but to delivery at Austin and Giddings, Tex., the destinations of the shipments. We

say this is clear, because it would be absurd to suppose that, when the fruit was offered to them at $1.60 per box at the place of shipment, they would offer to pay $2.40 per box at the same place and under the same conditions, and in each instance pay in addition thereto the freight charges. And it is, we think, of note that in reply to that offer made by appellants, appellees stated that they could not accept a "lower price than quoted, viz. $1.60 f. o. b.+90.2 frt."

In other words, a fair implication from the correspondence referred to is that both parties understood that delivery was to be made at the places of destination, in accordance with the prevailing custom at those points; that appellants offered to pay $2.40 per box for such delivery, and appellees, in effect, offered to make such delivery for $2.50²/₁₀ per box. At any rate, it is quite clear that such was appellants' understanding; and therefore, as the contract was silent upon that subject, it ought not to be held that they contracted otherwise. A contract to deliver f. o. b., in the absence of any additional proof, is prima facie a contract that delivery to the carrier shall constitute delivery to the purchaser; but such is not always the case. The rule upon that subject is correctly stated in 35 Cyc. p. 174, as follows:

"Ordinarily, when goods are to be shipped by the seller and at his expense, to the place of business of the buyer, such place is the place of delivery; but the prepayment of freight by the seller does not conclusively show that the place of delivery is the buyer's place of business. Similarly, if the agreement is to sell goods 'f. o. b.' at a designated place, such place will ordinarily be regarded as the place of delivery; but the effect of the 'f. o. b.' depends on the connection in which it is used, and, if used in connection with the words fixing the price only, it will not be construed as fixing the place of delivery."

We have been strongly inclined to reverse the action of the trial court, and render judgment for appellants, but have finally concluded to reverse and remand the case for another trial; and it is so ordered.

Reversed and remanded.